REX B. FOSTER AND BETTY C. FOSTER v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Foster v. Commissioner
Docket No. 164-71.
United States Tax Court
T.C. Memo 1973-13; 1973 Tax Ct. Memo LEXIS 271; 32 T.C.M. (CCH) 42; T.C.M. (RIA) 73013; January 23, 1973, Filed *271 When depressed market conditions severely affected the profitability of "color" Shetland ponies, petitioners opted to convert their herd to "show" ponies in order to produce a more marketable pony. HELD: Since the taxable years in question were formative years in the conversion of petitioners' pony herd, the petitioners were engaged in the business of breeding Shetland ponies with the intention of making a profit. Marion Hirschburg, for the petitioners. Robert J. Murray, for the respondent. IRWIN
MEMORANDUM FINDINGS OF FACT AND OPINION IRWIN, Judge: Respondent determined the following deficiencies in peitioners' income taxes: 2 Year
Deficiency
1964
$6,355.11
1965
14,307.11
1966
10,590.03
1967
3,723.63
We must decide whether petitioners were *272 engaged in the business of breeding and raising Shetland ponies during the years in question and, therefore, entitled to deduct from other income the losses incurred from such operation. If we decide that petitioners were not so engaged, we must then determine whether respondent has the right to readjust petitioners' base period income for the purpose of computing their averageable income for the taxable year 1965, even though assessment and collection of the additional tax liabilities determined for the taxable years 1961, 1962 and 1963 are barred by the statute of limitations set forth in section 6501 of the Code. [1] In any event, because of certain concessions made by the parties, a computation under Rule 50 will be required. FINDINGS OF FACT Some of the facts have been stipulated. These stipulated facts, along with the exhibits attached thereto, are herein incorporated by this reference. 3 Petitioners are husband and wife who resided in Delray Beach, Fla., at the time their petition in this case was filed. For the years in question, their joint Federal income tax returns were *273 filed with the district director of internal revenue in Des Moines, Iowa. Petitioners were both 68 years of age at the time of trial. Rex B. Foster is a dental surgeon and he practiced oral surgery as a member of the partnership of Foster and Foster in Waterloo, Iowa, during the years 1964, 1965 and 1966. Betty C. Foster received her advanced education at the Rockford College for Women. During 1964, 1965 and 1966 petitioners lived at Rangemore Farms, R.R. #4, Waterloo, Iowa, where they maintained a herd of Shetland ponies. On January 1, 1967, for health reasons (Dr. Foster had incurred two heart attacks and was suffering from Raynaud's disease), Dr. Foster ceased to practice dentistry and petitioners moved to Florida where Dr. Foster then devoted his time to the Shetland pony venture and other farming operations. At the time of this move petitioners acquired 16.2 acres of land in Florida, five acres of which was used for a citrus grove, the remaining acreage (11.2 acres) being utilized for petitioners' pony raising activities. Petitioners first became interested in raising Shetland ponies in 1955. At the time, their interest was in building 4 a sizable herd of "color" *274 ponies, the type of Shetland then in demand. These ponies were rather short and stocky and breeders thereof were desirous of raising ponies showing the color demanded by a very faddish buyer's market. The first popular color was a silver dapple; then the vogue became the sorrel, somewhat reddish in color; and from there the palomino with a golden color became the fashion. Petitioners' goal was to establish a championship strain of brood mares which in the future would enable petitioners to hold annual disposal sales at which each year's crop of foals would be sold. It would take a number of years of breeding, selecting, and culling by petitioners to develop the bloodlines required to insure profitable yearly disposal sales. At the outset, in 1955 and 1956, petitioners conducted their pony raising activities on a small acreage near Waterloo, Iowa. In 1957, in order to expand their operation, petitioners acquired a tract of approximately 80 acres near the city limits of Waterloo. They built thereon a home at a contract price of $37,500 and moved into it in 1957. During the years 1957 through 1966 petitioners utilized a portion of this tract to raise their ponies. They erected *275 various improvements on this tract over the years at the respective costs indicated below: 5 Name
Constructed
Costs PonyBarn
1957
$11,704.96
Pole Barn
1957
1,924.06
Fence
1957
2,977.43
Well
1957
1,576.71
Loafing Barn
1959
765.86
Loafing Barn
1959
2,273.28
Water Heaters
1959
173.10
Black Top
1959
260.00
Duck Stall
1960
484.02
Barn (Imp.)
1960
950.00
Machine Shed
1960
100.00
Corn Crib
1960
250.00
Garage - Water
1960-1961
459.85
Tile
1962
250.75
Fence
1962
656.26
Barn
1962
3,312.96
Fence
1963
1,444.01
Total
$29,563.25
It was somewhat inconvenient for the Fosters to live in the country in that their farm was located eight miles south of Waterloo where Dr. Foster's dentistry practice was located and where most of petitioners' friends resided. The farm was also 10 to 17 miles from the three hospitals Dr. Foster had to frequent. The acreage upon which the pony raising activities were conducted contained no special hunting or fishing facilities. Except for an annual exhibition for 4-H children, the property was not used for other than the usual amount of entertaining guests and friends. Petitioners' pony *276 raising operations were conducted under the name of "Rangemore Farms." The checks used by petitioners in paying bills and obligations pertaining to these activities bore the "Rangemore" name. Their stationery 6 also bore the "Rangemore" name. Petitioners advertised their ponies under this name. Petitioners maintained a separate bank account for their pony operation and they maintained a single entry set of books in which were entered all receipts and disbursements connected with their pony raising activities. Between 1955 and 1960, with many people interested in acquiring "color" breeding ponies for the purpose of developing their herds, good prices prevailed for the sellers of such ponies. Beginning in 1960 or 1961, however, the number of people having such an interest leveled off and the prices which good animals would bring began to decline markedly. The market reached a saturation point by 1962 and many breeders, Dr. Foster among them, found that their herds were worth much less than they had anticipated. During 1962 the market value of the "color" ponies was further affected by a change in emphasis from an animal showing certain color characteristics to an animal *277 which could perform well in the show ring. The "color" ponies in vogue prior to this change were not good show animals. Good performance ponies were larger, finer boned, and longer necked animals than the colored ponies and had much more trotting action than their colored counterparts. Despite the increasing demand for "show" ponies, the prices for ponies, "show" ponies included, continued in a depressed 7 state to the day of the trial herein. In 1962 these two market depressing forces caused many of petitioners' fellow breeders to go out of business. Many dispersal sales occurred at which these breeders sold all of their animals and attempted to recoup as much of their investment as possible under the circumstances. Petitioners, on the other hand, rather than selling out, decided to protect their enterprise by converting their herd into "show" ponies. Petitioners felt that this conversion would ultimately be profitable although it would delay, for perhaps another ten years, any return on their years of investment. They eliminated low caliber ponies from their herd and began a program of buying ponies to successfully inbreed with the high quality mares they already owned. *278 This would eventually produce a uniform product, i.e., championship show ponies, which could be successfully marketed. Their program of selective breeding and culling began to show results in 1966, when Top Brass, the championship show pony which petitioners raised, was sold. During the years in issue, petitioners owned a substantial number of Shetland ponies. The records of the American Shetland Pony Club ("A.S.P.C.") indicate that there were 69, 64, 86 and 76 animals registered in petitioners' names at the close of the taxable years 1964 through 1967, respectively. These records also indicate that petitioners sold 19 registered 8 ponies in 1964, 16 registered ponies in 1965, 6 registered ponies in 1966, and 23 registered ponies in 1967. The records of the A.S.P.C. do not necessarily reflect the actual number of ponies owned by each breeder and are not complete indices of the size of a breeder's herd. The reason for this discrepancy is that breeders do not register all of their foals; that decision is postponed until it can be determined whether the foals will measure up to the breeder's specifications. While it is unclear from the record what Dr. Foster's total number *279 of ponies in each of the taxable years actually was, it no doubt was a larger number than shown in the A.S.P.C. records. Burton Zuege, executive secretary of the A.S.P.C., testified that there are no sanctions or ways of insuring that the registrations submitted to the A.S.P.C. are accurate and reliable. However, if suspicious registrations are submitted, the A.S.P.C. investigates the breeder's operations. In the case of Dr. Foster, Mr. Zuege testified that at no time was there any doubt as to the veracity of Dr. Foster's registrations and, moreover, Mr. Zuege was of the opinion that Dr. Foster ranked within the top 10 percent of pony breeders in the United States. Furthermore, it was also Mr. Zuege's opinion that although petitioners were not producing "winning" ponies before their conversion, they were breeding and selling championship stock afterwards. 9 Dr. Foster is a qualified judge of Shetland ponies. He took a special course on schooling Shetland ponies at the University of Missouri. During the years 1964, 1965 and 1966 Dr. Foster spent two or three hours every evening working with his animals, even though he was a partner during the day in a busy oral surgery *280 practice. Daily Mrs. Foster worked with her husband and on her own in this activity; she cleaned barns, fed the ponies, washed blankets and towels, braided the ponies' manes and tails, gave the ponies baths, and prepared them for shows and sales. Petitioners won many trophies and ribbons during the years of operating this activity. These awards were of little monetary value but they did create a good name for "Rangemore Farms." The awards were won in pony shows in various states and at the National Shetland Pony Show. By winning these awards and trophies, petitioners enhanced the reputation of their operation in the eyes of other breeders. Petitioners hired Gordon Odegard, a young man learning to train ponies, in 1957 or 1958 to assist them in training ponies at Rangemore Farms. It is unclear from the record when that relationship was terminated. Subsequent thereto, however, petitioners opted to ship about one-third of the number of ponies previously in training to another trainer for such preparation rather than hiring another trainer to 10 work at Rangemore Farms. When petitioners moved to Florida in 1967 because of Dr. Foster's health, they divided their pony herd *281 into four sections. They sent approximately three-quarters of their animals to other pony breeders pursuant to an agreement that they would receive one-half of the foals produced by their animals free of charge. Petitioners took approximately 18 animals with them to Florida. Al Schmidt, a friend of the Fosters and also a pony breeder before the market forced him out of business in 1962, testified that in his petitioners were headed in the right direction, having made the decision to continue in the pony business facing a depressed and at the same time changing market. Because of his continued bad health, Dr. Foster, at the date of trial, upon his doctor's advice, was getting completely out of the pony business. He testified, however, that had his health not prevented it he would have certainly continued in his pony activities; he asserted that he was "at the top" and was finally producing the right type of pony. Petitioners' gross receipts from the farm operation during the years in question are as follows: 11 Gross Receipts from Farm
1964
1965
Nature of Income
Sch C
Sch D
Sch C
Sch D
Sales of Ponies
$2,329.50
$150.00
$5,085.28
Rentals
1,983.12
2,000.00
Prize Money
238.59
$4,551.21
150.00
$7,085.28
1966
1967
Nature of Income
Sch C
Sch D
Sch C
Sch D
Sale of Ponies
$3,050.00
$5,908.50
Stall Rentals
300.00
Prize Money
284.50
$3,334.50
$6,208.50
*282 Petitioners reported gross operating receipts from their pony raising activities, net losses from such activities, and partnership income from Dr. Foster's oral surgery practice on their respective income tax returns for the years 1955 through 1970 as follows: Schedule C
Year
Gross Receipts
Net Losses
Rex B. Foster's
Distributable Share
Of Partnership Income
1955
$-0-
$1,947.64
$ 13,725.00
1956
800.00
4,404.14
15,702.09
1957
16,508.77
2,052.42
11,348.33
1958
2,405.00
11,593.34
10, 633.33
1959
4,140.95
10,340.83
22,325.09
1960
2,325.84
13,789.38
21.595.18
1961
2,246.50
17,381.37
33,835.59
19 62
3,588.17
16,147.79
32.675.98
1963
4,599,75
19,818.51
28,217.28
1964
4,614.21
16,273.47
29,771.27
1965
7,085 .28
17,107.46
48,241.15
1966
3,334.50
17,903.65
40,350.00
1967
6,208.50
7, 546.00
21,600.00
1968
4,250.00
397.19
19,200.00
1969
7,330.00
1,150.86
16,800.00
1970
3,694.18
883.95
14,000.00
Totals
$73,131.65
$158,738.00
$380,020.29 12 During the taxable years in issue, petitioners incurred operating expenses in connection with their Shetland pony raising activities for the *283 purposes indicated and in the amounts set forth on the following schedule: 1964
1965
1966
1967
Hay and Fuel
$1,232.07
$1,148.92
$480.20
$ 800.02
Labor
2,044.55
3,861.36
3,046.25
1,132.92
Shoeing
1,036.50
552.00
467.50
522.50
Insurance
468.58
308.84
163.75
1,224.78
Registration Fees
398.00
144.00
965.00
629.50
Pasture and Grass
-0-
565.05
-0-
-0-
Fertilizer and Lime
-0-
-0-
-0-
165.00
Misc. Expense
1,381.14
69.04
595.25
736.15
Veterinarian
485.00
521.00
259.50
351.50
Repairs and Main.
747.97
825.41
166.09
118.40
Supplies
771.64
312.02
460.85
776.92
Journal and Dues
22.50
44.12
155.03
9.50
Training and Comm.
2,592.98
111.90
4,109.45
791.00
Advertising
386.82
404.80
707.85
260.93
Farm Travel
-0-
146.07
257.67
-0-
Show and Exhibiting
-0-
4,521.51
-0-
-0-
Interest
-0-
9.09
-0-
-0-
Taxes
613.46
1,188.71
1,254.24
1,2 54.24
Telephone
263.93
248.51
252.27
164.68
Utilities
662.96
352.60
459.85
323.17
Bedding
53.35
182.50
124.00 -0-
Gasoline
-0-
530.23
321.99
321.42
Trucking
404.86
1,131.54
677.00
1,256.75
Fuel
-0-
250.00
-0-
-0-
Truck and Tractor
580.06
-0-
185.44
78.22
Drugs
-0-
-0-
72.62
57.41
Bank Charges
-0-
-0-
44.35
-0-
Operating Expenses
$14,146.37
$17,429.22
$15,225.15
$ 10,975.01
Depreciation
6,741.31
6,563.52
6,013.00
2,779.49
Total
$20,887.68
$23,992.74
$21.238.15
$13,754.50
*284 ULTIMATE FINDINGS OF FACT
During the years 1964, 1965, 1966 and 1967, petitioners were engaged in the business of raising Shetland ponies with the intention of making a profit. 13 OPINION
It is well established that breeding, raising and training horses for sale may constitute a trade or business. (C.A. 2, 1922). Nevertheless, an activity may not be classified as a trade or business unless a taxpayer can prove that he had a bona fide intention of making a profit therefrom. It is not necessary, however, that the expectation of profit be a reasonable one, as long as it is genuine. , affd. (C.A. 2, 1967). In any event, this issue is essentially a question of fact to be decided upon the particular circumstances of each case. Upon extensive examination of the facts and circumstances of this particular case, we are of the opinion that petitioners were in the business of raising and breeding Shetland ponies during the taxable years 1964, 1965, 1966 and 1967 and that they possessed the requisite genuine *285 expectation of making a profit from these activities. The four taxable years in question here were trying ones for petitioners. Having embarked in 1955 on the venture of developing a championship herd of "color" Shetlands, the passage of time found two market forces developing to place their investment in jeopardy. The first was the gradual decline, and then complete fallout, 14 of the market for "color" ponies in the late fifties and early sixties. Then came the second market force, the growing demand for "show" ponies which would perform well in the prize ring. For many other breeders, the pressure was too much to bear and they went out of business by dispersing their herds. It was at this time, in 1961 and 1962, that petitioners decided to hold on and convert their herd to one which produced "show" ponies which were the new vogue. The Fosters knew that this would take additional years of selective breeding and would certainly delay the receipt of already overdue profits. The four years in question here were the years during which petitioners were in the process of converting their herd. Although in the short run it seemed quite doubtful that they would recoup the amount *286 they had already invested in their ponies, a successful conversion of their herd to championship show ponies would enable them to adequately manage the then bleak situation in their investment with the chance for overall profit in the long run. All through the taxable period petitioners managed to sell some of their existing herd and it was near the end of this period that the first of the championship performance ponies they produced became marketable (the sale of Top Brass in 1966). It was also at the close of the taxable period that Dr. Foster's health became a critical concern for the 15 petitioners and their pony operation. Two heart attacks and the difficulties of Raynaud's disease caused Dr. Foster's retirement from dentistry practice and prompted the move to Florida. The continued decline in his health, despite then brighter prospects with respect to his ponies, caused the doctor, at the time of trial, to begin the process of leaving the pony business altogether.
We are convinced that the Fosters, under the circumstances, did all that prudent, business conscious pony breeders would have done to insure success during these times. Rangemore Farms, after a considerable *287 investment, possessed adequate facilities to breed the ponies. Dr. Foster's expertise in pony breeding, the occasional help of a part-time trainer, the later shipment of ponies to another trainer, and the time spent by petitioners with their ponies evidence their desire to achieve success in conversion of their herd. Petitioners also were acquiring the animals which would successfully inbreed their extant herd to produce the show type ponies in demand. They enhanced the reputation of their farm through their very successful participation in horse shows and gained an outstanding reputation in the pony business; they advertised in trade journals; and they persistently bred and culled ponies seeking a herd possessed of sound breeding characteristics. 16 Dr. Foster's income from his dentistry practice, while ample, was not that of a very wealthy "gentleman farmer." In this financial condition we are convinced that Dr. Foster would not have made such large expenditures and engaged in the physical work required to breed these ponies over such a long period of time without having the intent of making a profit. Mrs. Foster also worked long and hard hours in helping further the enterprise. *288 A history of losses over a period of years may be an important factor bearing on a taxpayer's true intention; but "the presence of losses in the formative years of a business, particularly one involving the breeding of horses, is not inconsistent with the intention to achieve a later profitable level of operation * * *." . The years before us were formative years in that petitioners were developing a championship herd of "show" ponies and they proceeded in a fashion very consistent with an eventual profitable operation. Upon examination of the entire record herein, we conclude that petitioners were engaged in the business of raising Shetland ponies and that such was done with the intention of making a profit. Decision will be entered under Rule 50. Footnotes
1. All statutory references are to the Internal Revenue Code of 1954, as amended. ↩